UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**BRIAN ALAN YESKE**,                                    Case No. 6:14-cv-01671-KI

                        Plaintiff,                      OPINION AND ORDER

        v.

**COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION**,

                        Defendant.

        Max Rae
        P.O. Box 7790
        Salem, OR 97303

                Attorney for Plaintiff

        Billy J. Williams
        Acting United States Attorney
        District of Oregon

Page 1 - OPINION AND ORDER

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97201-2902

Alexis L. Toma
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900, M/S 221A
Seattle, WA 98104-7075

   Attorneys for Defendant

KING, Judge:

  Plaintiff Brian Yeske brings this action pursuant to section 205(g) of the Social Security

Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying Yeske's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").  I reverse the decision of the Commissioner and

remand for further proceedings.

## BACKGROUND

  Yeske protectively filed applications for DIB and SSI on June 29, 2010.  The applications

were denied initially and upon reconsideration.  After a timely request for a hearing, Yeske,

represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on

April 8, 2013.

  On May 3, 2013, the ALJ issued a decision finding Yeske not disabled within the

meaning of the Act and therefore not entitled to benefits.  This decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

September 26, 2014.

Page 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

Page 3 - OPINION AND ORDER

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations. *Id.*

### THE ALJ'S DECISION

The ALJ found Yeske met the insured status requirements for DIB through March 31,

2009. The ALJ also found Yeske had the following severe impairments: obesity; recurrent

cellulitis; schizoaffective disorder; post-traumatic stress disorder (PTSD); cognitive disorder;

personality disorder; attention deficit/hyperactivity disorder (ADHD); and major depressive

disorder. With the exception of Yeske's personality disorder, which the ALJ neglected to

discuss, the ALJ found that these impairments, either singly or in combination, did not meet or

medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P,

Appendix 1.

Given these impairments, the ALJ determined Yeske could perform light work with the

following conditions: occasionally climb ramps and stairs and occasionally crouch, but never

climb ladders, ropes or scaffolds; he could perform simple, routine and repetitive tasks consistent

with unskilled work; he was limited to performing low-stress work, defined as work requiring

few decisions and few changes; he should have no contact with the public, occasional superficial

contact with co-workers regarding trivial matters, and occasional contact with supervisors; he

should have no exposure to hazards. Given this residual functional capacity (RFC), Yeske could

perform work such as motel cleaner and price marker.

**FACTS**

Yeske's file is extensive, replete with records from 1994 and 1995 and even as far back as 1992 when Yeske was only seven years old. Yeske was 23 years old on his alleged disability onset date of December 2, 2007. He has a GED and some very limited work experience at a few different fish packing plants, a pizza place, as well as in the construction field. He has never held a job longer than six months.

As relevant to the period at issue, Yeske first sought treatment from Coastal Family Health Center in August 2008 for hemorrhoids. He said he had gained approximately 100 pounds in the last six months. He was 5'9" and weighed 333 pounds. In October, he reported a rash, a swollen gland, and was concerned about his weight gain. He was not depressed. Labs were ordered to determine a physiologic cause of the weight gain, and a CT was ordered to evaluate adenopathy. Results of these tests, if any, were not reflected in his chart.

Yeske sought care at Northwest Human Services in January 2010, seeking treatment for a sore throat.

In the meantime, Disability Determination Services referred Yeske for a physical examination as well as a psychodiagnostic examination. In the October 2010 physical examination with Steven Vander Waal, M.D., Yeske revealed he could sit for 20 minutes before needing to change position, he could stand for two hours, he could walk half a mile, and he could lift up to 25 pounds. At 5'8", he weighed 304 pounds. Upon examination, his back was tender over the lower thoracic and lumbar spine, and tender over the paravertebral muscles of the lower back. Straight leg raising was negative, and examination of his hips, knees, ankles and feet was normal. Gait was normal and he was able to perform tandem gait. He could balance on either

Page 6 - OPINION AND ORDER

foot.  He could stand on his tip toes and back on his heels.  He could not squat.  Dr. Vander

Waal, in his recommendations, noted, "His self-imposed limitations are noted above.  There are

no restrictions on his ability to hear, speak, travel or handle objects."  Tr. 447.  An x-ray found

the "lower lumbar lordorsis is markedly decreased.  The upper lumbar lordosis is slightly

reversed."  Tr. 450.  The findings were consistent with paraspinous muscle spasm; no bony injury

or degenerative disc disease was found.

Daryl Birney, Ph.D., conducted a psychodiagnostic evaluation the following week.  Yeske

presented with a bland and depressed mood, and reported problems sleeping.  He was living in a

shelter facility where he attended a required AA meeting once a week, cooked occasionally,

cleaned and did his laundry, went shopping, and spent his time watching television, playing

video games, and watching movies.  He was on probation for domestic violence against the

mother of his oldest daughter.  He had not recently been violent, but he would yell.  Dr. Birney's

conclusion was that,

> This man was raised in foster care and was physically abused in one foster home.
> In his teens he abused drugs.  He has worked only unskilled jobs and has not been
> able to sustain work beyond six months.  He had a history of depression
> interspersed with 'up' moods.  From the information he gave it was difficult to
> determine if a Bipolar Disorder exists.  He has ADHD symptoms.  His
> concentration and delayed recall are compromised.

Tr. 452.  Dr. Birney diagnosed recurrent Major Depressive Disorder, Bipolar Disorder NOS,

ADHD, and Personality Disorder NOS, and assigned a GAF of 45.[1]

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to
determine the individual's overall functioning. A GAF of 41 to 50 means "**Serious symptoms**
(e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious
impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a
job)."  The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental*

(continued...)

In December 2010, Yeske returned to Coastal Family Health Center for treatment of his back pain from falling off a ladder four years before. He had recently tried to lift a big display case weighing approximately 100 pounds about a month before and felt such intense pain he could not breathe. He had tried ibuprofen and Tylenol, as well as stretching, but felt he could not work because of the pain. Allison Mattila, DNP, gave him instructions on stretching and medications. He was given diclofenac potassium (an anti-inflammatory medication), neurontin, tramadol, and melatonin.

During 2011, Yeske sought care at Salem Hospital for hemorrhoids–after lifting a heavy barrel–and treatment on several occasions for bouts with cellulitis. He sought follow-up care for cellulitis with Northwest Human Services in September 2011.

Yeske applied for eligibility with Vocational Rehabilitation Services, which referred him for a neuropsychological evaluation in September 2011. Emil Slatick, Ph.D., prepared an extensive report covering Yeske's troubled youth (neglect by birth parents, placement in abusive foster homes from the age of two until nine, violent behavior as a child, history of dealing drugs, arrest as an adult for abuse of his girlfriend). Yeske had last been physically violent one and a half years before when he grabbed the back of his girlfriend's neck and threatened to kill her. He sometimes heard a voice calling his name and he suffered from insomnia. He told Dr. Slatick that he had never been able to hold a job and could not find work. He wanted to work if he could find something that he could do, but he could not repetitively bend or lift anything heavy, and his

---

[1](...continued)

*Disorders* 34 (4th ed. 2000) ("DSM-IV"). The most recent edition of the DSM eliminated the GAF scale. *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2012).

anger, depression and anxiety posed problems to obtaining and keeping work.  He was living "on

the streets."  Tr. 491.  He tested at a low average full scale IQ.  His processing speed was in the

5th percentile.  His performance on other tests suggested impaired neurological functioning.

>With respect to Yeske's performance on one test, Dr. Slatick reported:
>
>Validity indicators suggest that Brian did not respond to items on the MMPI-2 in
>an honest and forthright manner.  It appears that he intentionally over-reported
>items, endorsing excessive psychological and physical symptoms with the
>intention of appearing more severely impaired than is likely the case.  This does
>not necessarily mean that Brian is not experiencing genuine psychological and/or
>physical distress, only that he is likely exaggerating symptoms, possibly as a plea
>for help or for some other secondary gains.  Unfortunately, such a response style
>invalidates the resulting profile, making it uninterpretable.

Tr. 497.  Dr. Slatick commented that Yeske's concern about controlling his anger and violent

tendencies was "palpable and a threat to his general psychological integrity."  Tr. 498.  In his

conclusion, Dr. Slatick recommended Yeske apply for disability benefits "as the likelihood of his

being successful in employment endeavors is low given his current level of functioning.  Further,

the presence of impaired processing and memory functioning would indicate the need for

accommodations in academic, training, and employment environments."  Tr. 498.  Dr. Slatick

identified several standard accommodations, such as using a recording device to store instruction,

regular supervision and feedback, and instruction by demonstration.  Dr. Slatick diagnosed

schizoaffective disorder, PTSD, cognitive disorder NOS, amphetamine dependence in sustained

full remission, and personality disorder NOS with schizoid and paranoid features, and

recommended mental health treatment.

After receiving this evaluation, vocational counselor Linda Sisemore placed Yeske at

priority level 1, "Most Significantly Disabled."  Tr. 349.  She identified the following

impediments to employment:  interpersonal skills, self-direction, self care, and work skills.  He spelled and wrote at the third grade level, made poor decisions, had significant problems with concentration and memory, and avoided people.  She thought that for Yeske to be successful in maintaining employment "he will likely need accommodations for his cognitive and mental health issues."  Tr. 350.  To assist him, she met with him monthly until closing his file in March 2013.  She also referred him to the Homeless Outreach and Advocacy Program ("HOAP") to explore housing options and to obtain mental health care.

After meeting with Yeske in early November, HOAP counselor Louise McMahan, MS, QMHP, completed a report discussing Yeske's difficult childhood.  In addition, her report noted he had not taken psychiatric medications since he was 16 years old, and he had been clean and sober for five years, but he had been chronically homeless the past two years.  He confessed to being verbally aggressive.  McMahan diagnosed Yeske with PTSD, cognitive disorder NOS, amphetamine dependence in full sustained remission, and rule out personality disorder with schizoid or paranoid features.  She found his prognosis to be fair to good, observing him to be highly motivated to make changes in his life, but requiring intensive support services.  She commented that he was cooperative and pleasant, insightful, and open in providing even difficult information.

In November 2011, Yeske returned to Northwest Human Services complaining about back pain.  He reported being used to the pain, but every so often he had a flare up which affected him for a few days.  He felt radiation into the left leg; the pain was relieved by resting.  William Williams, PA-C, noted decreased lumbar mobility, posterior tenderness, but no

Page 10 - OPINION AND ORDER

paraverbral spasm and negative straight leg raising.  Williams recommended walking and weight loss, and gave Yeske samples of Celebrex and extended release cyclobenzaprine.

From November 2011 through February 2012, Jay L. Wung, M.D., treated Yeske's avoidance symptoms, as well as his irritability, insomnia and hypervigilance.  Yeske reported his psychological symptoms had significantly improved since his childhood, but Dr. Wung noted "symptoms remain[ed] moderately distressing and mildly impairing."  Tr. 546.  Yeske described past attempts to return to work, but that he had a history of emotional and physical outbursts at work.  Dr. Wung prescribed Trazodone and Celexa, with consideration of Lorazepam for situational stressors in the future.  At his follow-up appointment, Yeske complained of migraines from the Trazadone, and inability to afford Celexa.  Dr. Wung prescribed Mirtazapine, which Yeske felt was helpful.

During this time, Yeske met nearly weekly with McMahan at HOAP to arrange housing, get his driver's license, apply for disability and obtain counseling for his PTSD symptoms.  He talked about the return of violent dreams.  At the end of November, he reported feeling "on the rocks right now, but I'm working on it."  Tr. 1056.  She regularly described Yeske as cooperative and pleasant, as well as motivated.

In December 2011, Yeske returned to Northwest Human Services complaining of throbbing pain in the middle and lower areas of his back.  Daily activities aggravated his symptoms.  Examination showed no abnormality, kyphosis, or scoliosis, but Yeske was tender on his thoracic and lumbar spine and had a paraverbral muscle spasm.  He had normal lateral flexion, normal rotation, and negative straight leg raising.  Meghan Seeley, FNP, ordered x-rays and prescribed Meloxicam and Flexeril (cyclobenzaprine).

At an appointment in January 2012 with Robert Wolf, M.D., of Dr. Wung's office, Yeske reported increasing panic episodes and rage, for which he received a small course of clonazepam. To McMahan, Yeske expressed frustration and anger about events occurring in the group residence where he was living. She was able to redirect and calm his anger, agitation and frustration. Similarly, Yeske complained about his living situation to Sisemore, and reported he was not eligible for a janitorial job opportunity because of his criminal history.

Intoxication from clonazepam caused him to stop the medication by February; he preferred citalopram which had helped his anxiety. He and Dr. Wung discussed ways to medicate himself with other drugs in order to set up a situation for a trial off the citalopram. At his February counseling session with McMahan, Yeske discussed his "conflicts/anger reactions of late with store clerk and with HOAP staff." Tr. 1063. Yeske's placed his level of stress and anxiety at a 7. At his appointment with Sisemore, Yeske reported being out of medications for a month and feeling paranoid. He said Dr. Wung had left and he was having difficulty getting in to see the new doctor.

His anxiety level continued to be a 7 or 8 at his March counseling session with McMahan, but he was living in a new apartment, arranged through HOAP and a HUD grant, and felt better "now that I'm back on my medications." Tr. 1064. About a week later, he rated his anxiety at a 3, attributing his good mood to having his own apartment and being on medications. He continued reporting low anxiety–at a 5–at his counseling session at the end of March.

Yeske asked for a session in early April and met with Jacqueline Greer because "things were not going so well." Tr. 1067. Yeske's brother and drug-using girlfriend were living with him, he was worried about paying for his medications and having his power cut-off, and he was

self-medicating with his brother's prescription drugs.  In addition, he was donating plasma as his

primary source of income, and had felt ill.  He described feeling angry and wanting to get

revenge regardless of the consequences.  Four days later, he met again with Greer and did a

walking counseling session because he did not want to sit still.  He was overwhelmed by the

things he wanted to get done and was struggling with life stressors.  He felt motivated to get

healthier, he intended to get his fishing license, and he felt good being off of his medications.

His gait was not impeded by his back pain, but varied from day to day.  Yeske told Sisemore at

his April appointment that he was working on his housing and mental health, and could not focus

on coming up with an employment goal.

Yeske went to the emergency room in April 2012 complaining of left flank pain (i.e. in

his upper abdomen or back).  He had donated plasma the day before, as he had been doing

frequently.  He had taken his brother's oxycodone to little relief.  After a CT scan confirmed

Yeske did not have a kidney stone, an injection of a pain reliever called Dilaudid resolved the

pain and he was discharged home.

Yeske did not have a medication management session for several months until, in April,

he met with Joel Suckow, M.D.  Yeske told Dr. Suckow he was not taking his medications

because he did not believe they helped.  However, while Yeske was interested in restarting anti-

anxiety medications, Dr. Suckow did not think he was an appropriate candidate at that time.  Dr.

Suckow thought there was "no clear indication for psych med mgt at present.  No f/u scheduled

w/ me[.]"  Tr. 563.

Two days later, at the end of April, Yeske met with HOAP counselor Ann Tibbot,

LMSW, QMHP, about his goals.  He continued to insist he did not want medications as he felt

they took away his personality, but he agreed he did better while taking them.  He rated his

paranoia at 7 to 8.  Yeske told Sisemore he was doing well without his medications, but she

noted "that's because HOAP is spending so much time and effort with him."  Tr. 360.  By May,

Yeske told Sisemore he was on Celexa and Martizapine and reported they were working well.

    After a six-month interval in his back care, Yeske finally returned to Northwest Human

Services on June 15, 2012, at which time Olivia Kamayangi, M.D., noted Yeske's moderate back

pain, which was worsening and persistent.  He did not have his x-rays.  He reported pain at 9 out

of 10 on a bad day and 4 out of 10 on a good day.  He recognized he needed to lose weight.

Again, Yeske's examination was normal:  no abnormality, kyphosis, or scoliosis of the spine, no

posterior tenderness, normal flexion and lateral flexion, normal rotation, and negative straight leg

raising.  He was tender to palpation over the left lumbar region and left iliac crest.  Dr.

Kamayangi refilled his psych medications, referred him back to mental health, and informed him

that the clinic was no longer open to new narcotic contracts.

    Later that month, Yeske reported to his case manager that he was thinking about suicide.

She referred him to the Marion County Mental Health Program, where he was placed for a night

of respite.  He reported self-medicating his chronic pain with oxycodone, but had weaned himself

off the previous month.  He had been off Celexa since May 2012 because he could not pay for his

refill.  The next day, he reported the respite had been helpful.

    Less than two weeks after his appointment with Dr. Kamayangi, and the day after his

respite, Yeske sought treatment from the emergency room for his back pain.  He confessed to

having an addiction to oxycodone and that he was not looking for narcotics, but needed

something temporary.  Upon examination, Yeske demonstrated a normal range of motion, but

was tender in the mid thoracic and bilateral costal vertebral angle.  He was ambulatory.  The provider gave him naproxen and instructed him to follow up with his primary physician.  She also characterized Yeske as frustrated, but "polite and co-operative."  Tr. 1042.  Yeske revealed he had been in respite the previous night; he had stopped taking his mental health medications because he did not like his provider, Joel Suckow.  The emergency provider encouraged Yeske to talk with his physician about a new provider and to get back on medications.

Two days later, on June 28, 2012, Yeske attended therapy with a new therapist, Riley Crowder, QMHP.  Treatment notes indicate Yeske's "pretty massive slip" where he isolated himself, started dealing drugs and using oxycontin, and becoming violent with his half brother.  He stopped using and "is trying to put himself together."  Tr. 565.  Yeske reported "lash[ing] out verbally regularly[.]"  Tr. 567.  In July, he confessed to realizing how important his medications were to his functioning.

After missing a slew of appointments with Sisemore, Yeske finally showed up for his September appointment.  He confessed to being a person who needed medication; he was struggling with his moods.

In September, Yeske told Crowder he was feeling "fairly grounded and doing well though still struggling financially."  Tr. 571.  He felt frustrated by allowing his brother to live with him.  Yeske was feeling unfocused in October, but confessed to not taking his medications for two or three weeks.  He reported having a hard time with confrontation and argument without wanting to get violent.  His counselor planned to continue treating Yeske's anger and help him to set healthy boundaries.

Page 15 - OPINION AND ORDER

In early October 2012, Yeske returned to Dr. Kamayangi because he "never wanted to see Dr. Suckow" and he needed a referral to a different doctor to manage his mental health medications. Tr. 523. He said he had insomnia. The Celexa and mirtazapine were helping to a certain extent. He reported obsessive thoughts and paranoia. Dr. Kamayangi thought his history was confusing.

In late October 2012, Yeske returned to Salem Hospital's emergency room complaining of symptoms he thought meant cellulitis. The provider opined that the symptoms were more consistent with thrombophlebitis, but he could not rule out cellulitis. The provider prescribed aspirin, Keflex, Vicodin, Motrin, and Bactrim.

Yeske told Sisemore in November that he was doing informational interviews, his housing was good, he was seeing a counselor, and his medications were working. At his December appointment, he reported having trouble getting in to his see his doctor because his case manager at HOAP had been fired. He was not sleeping much. Yeske reported at his January meeting with Sisemore that he had a disagreement with his doctor and was told not to return. Sisemore referred him to the Salem Free Clinic.

After a four-month break, Yeske returned to Crowder for counseling in February 2013. He intended to pick up his medications now that he had reinitiated medication management. He was frustrated and irritated with people and organizations. Two weeks later, he continued to demonstrate stability but no improvement. Crowder encouraged more regular use of medications. In March, Yeske reported some improvement in day-to-day management of his emotions, but struggled in ongoing self care.

Page 16 - OPINION AND ORDER

Yeske missed mandatory appointments with Sisemore and she closed his vocational rehabilitation file on March 5, 2013. The closing note indicated Yeske had not complied with appointments, had difficulty stabilizing his mental health, and had not followed through with expectations beyond getting housing.

## DISCUSSION

Yeske attacks the ALJ's opinion on several grounds. First, he challenges the ALJ's determination that his back impairment is nonsevere. Second, he argues, the ALJ erred in failing to discuss the Vocational Rehabilitation Services' ("VRS") opinion about the extent of his need for assistance. Third, the ALJ failed to adequately consider Dr. Slatick's opinion. Fourth, the ALJ erred in his treatment of the personality disorder by not addressing it at step three or anywhere thereafter.

I.    Severity of Yeske's Back Impairment

The ALJ found Yeske failed to provide sufficient evidence of a back impairment. A medically determinable impairment must be established through signs, symptoms, and medically acceptable clinical or laboratory findings but under no circumstances can be established through symptoms, namely the individual's own perception of the impact of the impairment, alone. *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005).

However, as Yeske points out, the ALJ overlooked the evidence in support of a medically determinable impairment. The ALJ discussed the October 2010 x-ray, but only the part which found no degenerative disc disease or bony injury. He neglected to mention that the findings were consistent with paraspinous muscle spasm. The ALJ also commented that by November 2011, Yeske no longer exhibited muscle spasm. However, the ALJ overlooked the fact that just

one month later, Seeley found paravertebral muscle spasm on examination. Tr. 518. The ALJ erred in his conclusion that Yeske's back impairment was not severe.

Nevertheless, in assessing Yeske's RFC, the ALJ considered Yeske's back impairment. Specifically, the ALJ commented on the repeated normal examinations–negative straight leg raise, normal extension, normal lateral flexion, and normal rotation. In addition, as the Commissioner points out, the ALJ relied on the opinions of two state agency consultants who concluded Yeske could perform a reduced range of light work, despite his back impairment. Tr. 106, 122. There is no medical evidence to the contrary. The consultative examiner, Dr. Vander Waal, merely listed Yeske's "self-imposed limitations" and did not give any functional restrictions. Tr. 447. Accordingly, Yeske has failed to identify a functional restriction established by medical evidence in the record that should have been included in the RFC.

Yeske instead relies on his own testimony and his own reports to his physicians to support additional functional restrictions, such as the need to miss work during flare ups. Yeske's testimony was not nearly that specific. Instead, he testified that if he had to work his "back would go out" (Tr. 69), and he revealed in his function report an inability to bend (Tr. 253), lay down (Tr. 260), or perform yard work (Tr. 264), and that Aspirin made the pain better (Tr. 260). The ALJ concluded, in the context of obesity, that Yeske's functional limitations were not as severe as he alleged. The ALJ relied on Dr. Vander Waal's examination, including Yeske's tender lower thoracic and lumbar spine, but normal gait, ability to tandem walk, normal hips, knees, ankles, and feet, ability to balance, and ability to lift 25 pounds. Additionally, the ALJ repeatedly raised concerns about Yeske's "allegations of debilitating symptoms" and rejected them based on Dr. Slatick's testing which suggested likelihood of exaggeration of his

physical and psychological problems as a plea for help or for secondary gain, his daily activities including fishing, shopping, walking, and taking public transportation, and consultative medical opinions that Yeske could perform a reduced range of light work.  Tr. 30.

In sum, since the ALJ fully considered the medical evidence identifying functional limitations associated with Yeske's back impairment, and since he rejected Yeske's symptom testimony for his related physical impairments, I cannot conclude that accepting a back impairment as a severe impairment at step two would have altered the determination.  As a result, the ALJ's error was harmless.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (error is harmless where ALJ does not list severe impairment at step two, but analyzes effects on RFC at subsequent step).

II.    <u>Vocational Rehabilitation Services' Determination</u>

The ALJ neglected to discuss the VRS eligibility determination or any of Sisemore's notes about her meetings with Yeske.  Yeske contends the VRS eligibility determination is a disability determination which the ALJ was not only required to consider, but to which the ALJ was required to give great weight.  SSR 06-3p (ALJ must "explain the consideration given to [a disability decision by any governmental agency.]"); *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) ("ALJ must ordinarily give great weight to a VA determination of disability").

Courts in this district have rejected the argument Yeske makes regarding application of SSR 06-3p to a VRS eligibility determination.  *Link v. Astrue*, No. 3:11-cv-01025-JE, 2012 WL 5037029 (D. Or. Oct. 16, 2012) (different from social security system, VR-eligible candidate may be characterized as "most significantly disabled" even if employed); *Parker v. Colvin*, No. 6:13-

cv-00656-JO, 2014 WL 3672923 (D. Or. July 22, 2014) (same, therefore not a "disability

determination" within the meaning of SSR 06-03p).  However, the Ninth Circuit remanded the

latter case on a stipulated remand and included an instruction for the ALJ to "consider the

October 16, 2007 Office of Vocational Rehabilitation Services classification that [claimant] is

most significantly disabled pursuant to Social Security Ruling 06-03p."  *Parker*, No. 14-35794

(9th Cir. Mar. 12, 2015) (internal citations omitted).

      As an initial matter, contrary to Yeske's assertion, even if the VRS determination is the

kind of disability opinion contemplated by SSR 06-3p, it is not binding on the Commissioner.

SSR 06-3p ("We must make a disability or blindness determination based on social security

law.").  Nevertheless, at the very least, the eligibility determination is an "other source" opinion

that the ALJ was required to consider.  20 C.F.R. §§ 404.1513(d), 416.913(d) (other sources may

be considered when evaluating severity of impairments).  The ALJ may reject the opinions of

such sources by giving reasons that are "germane" to that source, which the ALJ failed to do

here.  *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010).

      The Commissioner concedes the ALJ erred but argues the failure to acknowledge the

VRS eligibility determination is harmless error for two reasons.  First, the RFC accommodates

Yeske's cognitive and mental issues.  Additionally, Sisemore's opinion is based on Yeske's

reports to her, which the ALJ properly discounted.

      I disagree.  While the RFC may account for Yeske's cognitive limitations–simple, routine

and repetitive work, for example–it does not fully address his emotional and mental health issues.

For example, because the ALJ did not discuss Sisemore's notes, he did not mention the fact that

Yeske had been chronically homeless for two years prior to Sisemore's intervention, nor did it

discuss Yeske's violent history.  The ALJ also did not address the extent to which Yeske required

assistance to obtain and remain in housing, and the lack of improvement he made with his

employment goals despite the intensive, near-weekly mental health appointments and monthly

vocational assistance appointments.  With respect to whether Sisemore's opinion is based on

Yeske's self-reports, I note that, to the contrary, Sisemore specifically referenced Dr. Slatick's

opinion.  See Tr. 346 (listing support for cognitive disorder); Tr. 349 (reference to

neuropsychological evaluation supporting cognitive disorder).

In short, I could not say that the ALJ's failure to discuss Sisemore's eligibility evaluation

of Yeske, and failure to discuss Sisemore's notes about Yeske and his failure to improve, was

harmless error.  In considering the VRS determination, and Sisemore's other notes, the ALJ

should consider:  (1) how long the source has known the claimant and how frequently the source

has seen the claimant; (2) whether the opinion is consistent with other evidence; (3) the degree to

which the source presents relevant evidence supporting an opinion; (4) how well the source

explains the opinion; and (5) whether the source has a specialty or area of expertise related to the

claimant's impairments.  SSR 06-03p.  The ALJ should consider Yeske's argument that

Sisemore's opinion should be heavily weighted because of her vocational expertise.

III.    Dr. Slatick's Opinion

Of all the doctors, Dr. Slatick undertook the most extensive testing of Yeske and noted,

as the ALJ pointed out, that Yeske had sufficiently strong intellectual abilities to perform a wide

variety of employment.  However, this conclusion was tempered by other test results suggesting

Yeske would not be able to actually function at that level.  Dr. Slatick also recommended Yeske

apply for disability benefits as he thought Yeske would not likely be successfully employed given

his level of functioning.  Yeske contends the ALJ's RFC did not account for Yeske's processing speed limitation, his memory limitation, or his elementary school-level spelling, writing and math abilities.  Further, Yeske argues, the ALJ did not give clear and convincing reasons or specific and legitimate reasons for rejecting the standard accommodations Dr. Slatick recommended.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  *Widmark*, 454 F.3d at 1066 n.2.  Since Dr. Slatick's opinion was contradicted by both nonexamining physicians, the ALJ was required to give specific and legitimate reasons for only partially weighing Dr. Slatick's opinion.[2]

---

[2]Yeske seems to suggest that the ALJ was required to actually state that he was giving Dr. Slatick's opinion less weight because of the nonexamining physicians' opinions.  The law simply requires the ALJ to "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings."  *Orn*, 495 F.3d at 632.  The ALJ satisfied this requirement.  *See also Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) (ALJ need not recite "magic words" so long as court may draw inferences).

Yeske questions whether a conflict exists at all.  He notes that the other medical sources did not have the benefit of the testing performed by Dr. Slatick, demonstrating Yeske's slow processing speed, memory problems, and low grade-level spelling, writing and math abilities. Further, he argues, Dr. Birney's test results were consistent with Dr. Slatick's, and Dr. Birney did not offer an opinion on Yeske's functional limitations.

Nonexamining physicians Dr. Anderson and Dr. Kennemer relied on Dr. Birney's examination by specifically noting his findings on Yeske's depressed mood, low average intellect, and attention and concentration problems in coming to their conclusion that Yeske could perform simple and repetitive work.  Tr. 103; 119.  The fact that these nonexamining physicians lacked the more precise test results from Dr. Slatick's examination does not eliminate a conflict; rather, the newer testing is a factor in determining the persuasiveness of those opinions.  In the end, the ALJ was faced with opinions from nonexamining physicians opining Yeske could work and Dr. Slatick's conclusion that Yeske's "success[] in employment" would be "low" "given his current level of functioning."  Tr. 498.  Thus, the ALJ was required to give specific and legitimate reasons to give only partial weight to Dr. Slatick's opinion.

The ALJ listed the following reasons for giving Dr. Slatick's opinion only partial weight: Yeske appeared pleasant, cooperative, and clear, without behavioral problems, and without excessive anxiety, which was inconsistent with the accommodations identified by Dr. Slatick; the MMPI-2 suggested exaggerated symptoms; and Yeske's intellectual functioning was strong enough to allow adequate work performance.  The ALJ said he gave Dr. Slatick's opinion some weight because Yeske showed deficits in processing speed.

Page 23 - OPINION AND ORDER

With respect to the accommodations identified by Dr. Slatick, as Yeske points out, they were based on his processing speed and memory deficits, not on his behavioral problems. Accordingly, Yeske's appropriate behavior in the interview is not a specific and legitimate reason to give Dr. Slatick's opinion less weight. Similarly, Yeske's performance on the MMPI-2 was unrelated to his performance on the other cognitive tests, on which Dr. Slatick reported Yeske "invest[ed] himself well[.]" Tr. 490. Accordingly, while the MMPI-2 test results may well be a proper factor in assessing the credibility of Yeske's subjective psychological and physical complaints, it was Yeske's "impaired processing and memory functioning" that indicated a need for accommodations. Tr. 498.

Additionally, the ALJ overstated Dr. Slatick's opinion about the significance of Yeske's intellectual test results. The ALJ picked up only Dr. Slatick's notation that Yeske's intellectual functioning was strong enough to perform adequately in a work environment, without recognizing Dr. Slatick's caveat that processing speed and memory deficits would negatively impact Yeske's ability to actually function at the level. Specifically, Dr. Slatick opined, "In addition to the processing deficit, impaired memory functioning in immediate memory, visual delayed memory, and auditory recognition along with impaired performance on the supplementary neuropsychological testing suggest the presence of organic impairment sufficient to interfere with functioning in academic, training, and employment environments." Tr. 498.

On this last point, the ALJ did not state how the RFC accounted for Yeske's processing speed and memory difficulties. The RFC did not include a pace limitation. Having accepted Dr. Slatick's opinion that Yeske has a low processing ability, the ALJ was required to indicate how he accommodated that limitation.

Page 24 - OPINION AND ORDER

Finally, the Commissioner contends Dr. Slatick's accommodations are mere recommendations and the ALJ was not required to incorporate them in the RFC, citing *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 85, 691-2 (9th Cir. 2009). As Yeske argues, however, Dr. Slatick repeatedly indicated that Yeske's processing speed and memory impairments would interfere with his functioning at work. As a result of these impairments, according to Dr. Slatick, Yeske needed accommodations in employment. The kinds of accommodations he identified as standard largely appear to address issues Yeske may have in job training. In sum, the ALJ must assess whether additional limitations should be included in the RFC, and whether adding those limitations would preclude the jobs he identified.

IV.    ALJ's Failure to Address Yeske's Personality Disorder

The ALJ found Yeske suffered from a personality disorder, among other mental impairments. However, he neglected to specifically evaluate the disorder pursuant to the psychiatric review technique ("PRTF") under step three. Since I am reversing and remanding for further proceedings, the ALJ is instructed to complete the technique with respect to Yeske's personality disorder.

V.    Remedy

The court has the discretion to remand the case for additional evidence and findings or to award benefits. *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002). The court may credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the

claimant disabled if the evidence is credited.  *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir.

2014).

Given the additional issues to address, including evidence from vocational rehabilitation

services, a more complete review of Dr. Slatick's opinion and the effect of Dr. Slatick's

accommodations (if accepted) on other work in the national economy, and a step three analysis of

Yeske's personality disorder, it is appropriate to remand this case for further review by the ALJ.

## CONCLUSION

The decision of the Commissioner is reversed.  This action is remanded to the

Commissioner under sentence four of 42 U.S.C. § 405(g) for further review as explained above.

Judgment will be entered.

IT IS SO ORDERED.

DATED this 7th day of December, 2015.


    /s/ Garr M. King
Garr M. King
United States District Judge


Page 26 - OPINION AND ORDER